OPINION OF THE COURT
Jones, J.
Although they were aware that there was a broad, undifferentiated risk of an explosion in consequence of ambient magnesium stearate dust arising from the procedures employed in its manufacturing operations, the corporate and individual defendants may nonetheless not be held criminally liable, on the theory of either reckless or negligent conduct, for the deaths of employees occasioned when such an explosion occurred where the triggering cause thereof was neither foreseen nor foreseeable.
This case is before us on appeal from an order of the Appellate Division which reversed an order of Supreme Court granting defendants’ motion to dismiss the indictment on the ground that the evidence before the Grand Jury was not legally sufficient to establish the offenses charged or any lesser included offenses (CPL 210.20, subd 1, par [b]). On such a motion the standard of judicial scrutiny is whether there was "competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof’ (CPL 70.10, subd 1). In the somewhat unusual circumstances of this case defendants introduced *299 extensive evidence before the Grand Jury; for our purposes, however, the evidence must be viewed in the light most favorable to the People, and it may be legally sufficient "although it does not even provide 'reasonable cause’ to believe that the defendant committed the crime charged” (Denzer, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 70.10, p 348). We describe the factual context out of which this indictment arose from that standpoint, recognizing that in our description no note is taken of the considerable exculpatory evidence introduced on behalf of defendants.
Defendant Warner-Lambert Co. is a manufacturing corporation which produces, among other items, Freshen-Up chewing gum. The individual defendants were officers or employees of the corporation. Defendant Kraft was vice-president in charge of manufacturing; defendant Harris was the director of corporate safety and security; defendants O’Mahoney and O’Rourke were, respectively, plant manager and plant engineer of the Warner-Lambert facility located at 30-30 Thompson Avenue in Long Island City, New York, which was the situs of the events out of which this indictment arose. The indictment charges each defendant with six counts of manslaughter in the second degree in violation of section 125.15 of the Penal Law and six counts of criminally negligent homicide in violation of section 125.10 of the Penal Law in consequence of the deaths of six employees which resulted from a massive explosion and fire at the Long Island City Warner-Lambert plant about 2:30 a.m. on November 21, 1976.
On the day on which the explosion occurred, Freshen-Up gum, which is retailed in the shape of a square tablet with a jelly like center, was being produced at the Warner-Lambert plant by a process in which filled ropes of the gum were passed through a bed of magnesium stearate (MS), a dry, dustlike lubricant which was applied by hand, then into a die-cut punch (a Uniplast machine) which was sprayed with a cooling agent (liquid nitrogen), where the gum was formed into the square tablets. Both the MS (normally an inert, organic compound) and the liquid nitrogen were employed to prevent the chicle from adhering to the sizing and cutting machinery, the tendency to adhere being less if a dry lubricant was used and the punch was kept at a low temperature. The process produced a dispersal of MS dust in the air and an accumulation of it at the base of the Uniplast machine and on *300 overhead pipes; some also remained ambient in the atmosphere in the surrounding area.
Both MS and liquid nitrogen are considered safe and are widely used in the industry. In bulk, MS will only burn or smoulder if ignited; however, like many substances, if suspended in the air in sufficient concentration the dust poses a substantial risk of explosion if ignited. The minimum concentration at which an explosion can occur is denominated the "lower explosion level” (LEL). Liquid nitrogen, with a boiling temperature of minus 422 degrees Fahrenheit, is an effective cryogenic which might play a part in the process of "liquefaction” — here, the production of liquid oxygen in the course of the condensation of air on its exposure to a source of intense cold. Liquid oxygen is highly volatile, is easily ignited and, if ignited, will explode. Among possible causes of such ignition of either liquid oxygen or ambient MS are electrical or mechanical sparks.
On November 21, 1976 defendant Warner-Lambert was operating six Uniplast machines in the production of Freshen-Up gum on the fourth floor of its Long Island City plant. The machines were in almost constant operation; however, at the time of the catastrophic explosion near the end of one of the work shifts only one machine (designated the "D” machine) was in operation and employees were engaged in removing settled MS dust from the base of that machine and from overhead pipes by broom sweeping and by the use of airhoses. Suddenly an explosion occurred in the area of the operating machine, followed almost immediately by a second, much larger explosion accompanied by flames which caused injuries to more than 50 workers in the area (six of whom did not survive) and extensive damage to the building and equipment, which was attributed to burning of ambient dust and explosion rather than general fire. Thorough postcatastrophe investigation eliminated intentional or "man-caused” ignition as the origin of the event. A New York City Fire Marshal and an investigator for the United States Occupational Safety and Health Administration, both of whom examined the scene, testified before the Grand Jury that a primary explosion had occurred at the "D” machine which dispersed added MS dust into the atmosphere and could have caused the second, greater explosion. There was testimony that the ceiling of the floor below the "D” machine had been covered with peeling paint, indicating that the temperature of that machine was *301 colder than the others and that an examination of the machine itself after the explosion had shown that its base, made of cast iron, had cracked, perhaps by reason of the cold. An employee present at the time of the occurrence testified that he had observed a spark in the area of the "D” machine immediately prior to the event. Although there was no direct proof as to what had triggered the early morning disaster, the People introduced expert testimony hypothesizing that there might have been a mechanical sparking induced by a breakup of metal parts of the Uniplast machine. Also presented was testimony by one of the People’s experts who theorized that liquid oxygen produced through liquefaction occurring in the Uniplast machine was ignited by the impact of a moving metal part and that this touched off the dispersed MS dust present.
With respect to the quantity of ambient MS dust in the area of the Uniplast machines (the presence of which was the basis for the People’s submission to the Grand Jury of evidence against the defendants ultimately indicted), there was proof that an inspection of the plant by Warner-Lambert’s insurance carrier in February, 1976 had resulted in advice to the insured that the dust condition in the Freshen-Up gum production area presented an explosion hazard and that the MS concentration was above the LEL, together with recommendations for installation of a dust exhaust system and modification of electrical equipment to meet standards for dust areas. Although a variety of proposals for altering the dust condition were considered by the individual defendants in consultations and communications with each other and some alterations in the MS application were made, both ambient and settled MS dust were still present on November 21, 1976, as the result of an executive decision to work toward the eventual elimination of MS entirely by modification of the Freshen-Up equipment. This modification had been accomplished with respect to only one Uniplast machine at the date of the explosion, when approximately 500 pounds of MS a day were still being used in Freshen-Up production. Employees were wearing face masks and goggles to protect their eyes and breathing passages, and just prior to the tragedy, when sweeping and airhosing of accumulated MS were in progress, there was rising dust and a "heavy fog” or "mist” all around.
The charges of manslaughter in the second degree and criminally negligent homicide laid against the corporate and *302 individual defendants are each dependent on two interrelated provisions of the Penal Law. As to manslaughter in the second degree, the following provisions are pertinent:
"125.15 Manslaughter in the second degree
"A person is guilty of manslaughter in the second degree when:
"1. He recklessly causes the death of another person”.
"15.05 Culpability; definitions of culpable mental states
"The following definitions are applicable to this chapter:
* * *
"3. 'Recklessly.’ A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.”
As to criminally negligent homicide the following provisions are pertinent:
"§ 125.10 Criminally negligent homicide
"A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person.”
"§ 15.05 Culpability; definitions of culpable mental states
"The following definitions are applicable to this chapter:
* * *
"4. 'Criminal negligence.’ A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.”
For each of these crimes there must be "a substantial and unjustifiable risk”, and "[t]he risk must be of such nature and degree that disregard thereof [or, the failure to perceive it] *303 constitutes a gross deviation from the standard of conduct [or, care] that a reasonable person would observe in the situation.” The essence of manslaughter in the second degree is awareness accompanied by disregard of the risk; for criminally negligent homicide the essence is failure to perceive the risk (People v Stanfield, 36 NY2d 467, 470). With respect to each crime the culpable conduct of the defendant must have been the cause of the death of the other person or persons.
There have been relatively few reported cases (other than those involving vehicular homicide) in which judicial attention has been focused on the proof required to establish the commission of the crimes of manslaughter in the second degree or criminally negligent homicide. None has been drawn to our attention and our research has disclosed none in which the statutory provisions were applied to deaths occurring in the course of manufacturing operations.[1]
*304 There can be no doubt that there was competent evidence before the Grand Jury here which, if accepted as true, would have been sufficient to establish the existence of a broad, undifferentiated risk of explosion from ambient MS dust which had been brought to the attention of defendants. It may be assumed that, if it be so categorized, the risk was both substantial and unjustifiable. The issue before us, however, is whether defendants could be held criminally liable for what actually occurred, on theories either of reckless or negligent conduct, based on the evidence submitted to this Grand Jury, viewed in the light most favorable to the People. The focus of our attention must be on the issue of culpability, taking into account the conduct of defendants and the factors both of foreseeability and of causation, all of which in combination constitute the ultimate amalgam on which criminal liability may or may not be predicated.
First, we look at the evidence as to the actual event or chain of events which triggered the explosion — evidence which may only be characterized as hypothetical and speculative. There was direct testimony by eyewitnesses, confirmed by reconstruction of the physical evidence, that two explosions occurred. The first was a low-order detonation, occurring approximately two seconds before the major explosion, at the base of the "D” Uniplast machine, which was itself found to be in a substantially fragmented condition with gears, metal shafts, and other parts broken up and displaced; the second, *305 occurring in rapid succession, was a major explosion accompanied by fire which caused the massive destruction and personal injuries. The prosecution hypothesizes that under what it describes as "the most plausible of theories” the initial detonation was attributable to mechanical sparking resulting from the breakup of the metal parts of the Uniplast machine, possibly occasioned by the machine’s having become overheated or overloaded, by vibration, or by slipping of components. Testimony supporting this hypothesis included descriptions of the condition of the machine after the event, expert testimony that the physical evidence suggested mechanical failure prior to the first explosion and testimony of prior instances in which the machine had become overheated or metal parts had broken off. The District Attorney adds that "ignition produced by an electrical spark or arc emission from the non-explosion proof, over loaded Uniplast motor was not ruled out either”.
Another explanation for the initial explosion was offered by an expert called by the prosecution who hypothesized that liquid oxygen, produced through liquefaction as air condensed on the liquid nitrogen-cooled parts of the "D” machine, dripped onto settled MS dust at the base of the Uniplast, became trapped there and then, when subjected to the impact caused by a moving metal part, reacted violently, causing ignition of already dispersed MS.
Viewed most favorably to the People, the proof with respect to the actual cause of the explosion is speculative only, and as to at least one of the major hypotheses — that involving oxygen liquefaction — there was no evidence that that process was foreseeable or known to any of the defendants. In sum, there is no proof sufficient to support a finding that defendants foresaw or should have foreseen the physical cause of the explosion. This being so there was not legally sufficient evidence to establish the offenses charged or any lesser included offense.
It has been the position of the People that but-for causation is all that is required for the imposition of criminal liability. Thus, it is their submission, reduced to its simplest form, that there was evidence of a foreseeable and indeed foreseen risk of explosion of MS dust and that in consequence of defendants’ failure to remove the dust a fatal explosion occurred. The chain of physical events by which the explosion was set off, i.e., its particular cause, is to them a matter of total indiffer *306 ence. On oral argument the People contended that liability could be imposed if the cause of the explosion were the lighting of a match by an uninvited intruder or the striking of a bolt of lightning. In effect they would hold defendants to the status of guarantors until the ambient dust was removed. It thus appears that the People would invoke an expanded application of proximate cause principles lifted from the civil law of torts.
We have rejected the application of any such sweeping theory of culpability under our criminal law, however. We recently considered concepts of criminal culpability grounded in recklessness or negligence in People v Kibbe (35 NY2d 407).[2] In that case the defendants had abandoned their helplessly intoxicated robbery victim in subfreezing temperatures, without shoes or eyeglasses, by the side of an unlighted highway, and he was shortly thereafter struck and killed by a passing motorist. The critical issue in the case was whether the defendants should be held criminally liable for murder when the particular cause of death was vehicular impact rather than freezing. Under the theory now advanced by the People it would have been irrelevant that death had been the consequence of one particular chain of causation rather than another; it would have been enough that the defendants exposed their victim to the risk of death and that he died. That, of course, was not the analysis of culpability that we adopted. Recognizing that "[a] distance separates the negligence which renders one criminally liable from that which establishes civil liability” (People v Rosenheimer, 209 NY 115, 123) — both as to quantum and content of proof — we held that "the defendants should not be found guilty unless their conduct 'was a cause of death sufficiently direct as to meet the requirements of the criminal, and not the tort, law’ ” (35 NY2d, at p 412). "We subscribe to the requirement that the defendants’ actions must be a sufficiently direct cause of the ensuing death before there can be any imposition of criminal liability, and recognize, of course, that this standard is greater than that required to serve as a basis for tort liability” (id., at p 413). Thus, we were concerned for the nature of the chain of particularized events which in fact led to the victim’s death; it was not enough that death had occurred as the result of the defendants’ abandonment of their helpless victim. To analo *307 gize the factual situation in the case now before us to that in Kibbe it might be hypothesized that the abandoned victim in Kibbe instead of being either frozen to death or killed when struck by a passing motor vehicle was killed when struck by an airplane making an emergency landing on the highway or when hit by a stray bullet from a hunter’s rifle — occasions of death not reasonably to have been foreseen when the defendants abandoned their victim.
In view of our disposition of this appeal on the ground that, inasmuch as the evidence before the Grand Jury was not legally sufficient to establish the foreseeability of the actual immediate, triggering cause of the explosion, defendants cannot be held criminally culpable, we have no occasion to reach or consider whether the steps that they took with respect to the general risk of explosion were a gross deviation from the standard of care or conduct that a reasonable person would have observed in the situation.
For the reasons stated, we conclude that there was not legally sufficient evidence in this case on the premise of which any jury could permissibly have imposed criminal liability on any of these defendants.
Accordingly, the order of the Appellate Division should be reversed and the indictment dismissed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Meyer, Sweeney* and Cardamone* concur.
Order reversed, etc.

. Inasmuch as we find the causation issue hereafter discussed to be decisive of this appeal, we assume for purposes of this decision, without deciding, that sections 125.10 and 125.15 of the Penal Law are broad enough to cover deaths occurring in the course of manufacturing operations. We note, however, that no case applying these sections or the predecessor sections to such operations has been found; that no legislative history which mandates that conclusion has been found, either by the parties from whom we solicited submissions on that subject prior to reargument or by our independent research; and that tenable arguments for and against it can be made.
The arguments for are that the present sections were enacted as part of the general revision of the Penal Law, effective September 1, 1967, that the Commission Staff Notes on the Proposed Penal Law (adopted in 1967) stated with respect to the section on criminally negligent homicide that (at p 335) "The proposed crime * * * is one of general application, and no need or desirability is seen for individual, particularized provisions or offenses addressed to fatally negligent conduct in specific areas of activity”, that section 5.00 of the Penal Law declares that "The general rule that a penal statute is to be strictly construed does not apply to this chapter, but the provisions herein must be construed according to the fair import of their terms to promote justice and effect the objects of the law”, that the Practice Commentaries prepared by the former Counsel to the Commission on Revision state that section 125.10 "applies to a wide spectrum of fatal conduct of both commission and omission”, that the sections were fashioned on the Model Penal Code and like that code are stated in language which is clearly broad enough to include manufacturing operations.
The arguments against are that the history of the American Law Institute’s adoption of the Model Penal Code contains nothing other than the broad language of the sections to indicate that manufacturing operations were intended to be covered and that the history of the predecessor sections of the Penal Law (§§ 1052, 1053-a to 1053-f) is equivocal. The introductory language of section 1052 was internally narrowed by the inclusion within the section of paragraphs describing particularized conduct — "Women producing miscarriage”, "Negligent use of machinery”, "Mischievous animals”, "Overloading passenger vessel”, "Persons in charge of steamboats”, "Persons in charge of steam engines”, "Acts of physicians while intoxicated”, and "Persons making or keeping gunpowder contrary to law”. Sections 1053-a and 1053-b *304 dealt explicitly with criminal negligence in the operation of a motor vehicle; sections 1053-c and 1053-d covered criminal negligence in the use of a firearm or a long bow while hunting; and sections 1053-e and 1053-f addressed criminal negligence in the operation of a vessel. The paragraph in section 1052 captioned "Negligent use of machinery” (although facially so broad that if read literally it would have made unnecessary the particularization in co-ordinate internal paragraphs of that section) was first incorporated in our criminal law statutes in 1881 (L 1881, ch 676, § 195). No legislative history has been found which discloses the purpose for its introduction. It was not included in the draft proposal of 1865 and first appears in the proposal as amended in 1879. It may be argued, therefore, that prior to the enactment of the 1967 revision of the Penal Law there was no statutory proscription of general applicability and none specifically addressed to manufacturing operations.
The pertinent policy considerations (e.g., the protection of New York residents against injury or death knowingly or recklessly inflicted and of the State against the burden of having to care for and support persons so injured or killed on the one hand, as opposed to the possible adverse effect on the State’s economy of extending criminal liability to manufacturing operations on the other) are more properly for the Legislature than for the courts (cf. Fletcher, The Theory of Criminal Negligence: A Comparative Analysis, 119 U of Pa L Rev 401). It may be that the Legislature will wish to eliminate all equivocality.

. For subsequent proceedings see Henderson v Kibbe (431 US 145).