THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
ZALMAN DEITSCH, JOSEPH DEITSCH, BARUCH SCHER
and DEITSCH TEXTILE CORPORATION, Respondents.

Second Department, December 5, 1983

APPEARANCES OF COUNSEL

*Elizabeth Holtzman, District Attorney* (*Barbara D. Underwood, Lucille A. DiBello* and *Allan P. Root* of counsel), for appellant.

*Edward M. Rappaport* for Zalman Deitsch and others, respondents.

*Benjamin Spector* (*Joseph Frost* and *Gary L. Berenholtz* of counsel), for Baruch Scher, respondent. (One brief filed.)

OPINION OF THE COURT

BROWN, J.

On the afternoon of October 10, 1979, a fire erupted in a six-story warehouse operated by the defendant Deitsch Textile Corporation at 510 Waverly Avenue in Brooklyn. While those who were working on the ground floor escaped to safety, two employees were trapped on the sixth floor.

One was eventually rescued. The other, Nathaniel Logan, however, died. No cause for the fire was ever determined. Following an investigation, the defendants were indicted and charged with the crimes of manslaughter in the second degree, criminally negligent homicide and reckless endangerment in the first degree. Upon defendants' motion, Criminal Term dismissed the indictment upon the ground that the evidence before the Grand Jury did not establish a sufficient causal connection between defendants' actions and Logan's death. We reverse.

In reviewing a motion to dismiss an indictment on the ground of insufficiency, the court must look to see whether the evidence before the Grand Jury was "legally sufficient to establish the offense charged or any lesser included offense" (CPL 210.20, subd 1, par [b]; CPL 210.30; *People v Leichtweis,* 59 AD2d 383, 387).

Section 125.15 of the Penal Law provides, in part, that "a person is guilty of manslaughter in the second degree when * * * [he] recklessly causes the death of another person". Subdivision 3 of section 15.05 of the Penal Law defines "recklessly" in the following manner: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Section 125.10 of the Penal Law states that "[a] person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person". Subdivision 4 of section 15.05 of the Penal Law defines "criminal negligence" as follows: "A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Section 120.25 of

the Penal Law states that "[a] person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person". Thus, criminally negligent homicide is a lesser included offense of manslaughter in the second degree, differing only as to the mental state of the defendants (*People v Green,* 56 NY2d 427, 432-433; *People v Stanfield,* 36 NY2d 467). It follows, therefore, that the manslaughter charge must be reinstated if sufficient evidence exists as to the criminally negligent homicide charge (*People v Leichtweis, supra; People v Maier,* 72 AD2d 754).

The evidence before a Grand Jury is legally sufficient if there is competent evidence, which, if accepted as true, establishes every element of the offense charged or a lesser included offense and the defendant's commission thereof (CPL 70.10; see *People v Haney,* 30 NY2d 328; *People v Mayo,* 36 NY2d 1002; *People v Dunleavy,* 41 AD2d 717, affd 33 NY2d 573). Thus, it has been stated that "the evidence [before the Grand Jury] must be viewed in the light most favorable to the People, and it may be legally sufficient 'although it does not even provide "reasonable cause" to believe that the defendant committed the crime charged' (Denzer, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 70.10, p 348)" (*People v Warner-Lambert Co.,* 51 NY2d 295, 299, cert den *sub nom. New York v Warner-Lambert Co.,* 450 US 1031). The motion should be granted only upon a clear showing of insufficiency, with the burden of proof resting on the defendant (*People v Howell,* 3 NY2d 672, 675). In our view, the defendants here have failed to meet that burden.

The Grand Jury in this case heard testimony from six employees of the corporate defendant, including one of its managers. In addition, several firemen, a fire marshall, a fire chief and a police officer, all of whom had responded to the scene, testified. Testimony was also given by two building inspectors who had inspected the premises prior to the fire.

The testimony before the Grand Jury established that the premises were used by Deitsch Textile Corporation to bale and store cloth, and that Zalman Deitsch, the presi-

dent of the corporation, and his brother Joseph who had offices on the first floor of the building were at the warehouse every day, along with the foreman, Baruch Scher, running the corporate business and supervising its employees. It further reveals that the main section of the warehouse was six stories high, with a freight elevator providing the principal means of access to the upper floors. In addition, the warehouse contained two emergency escape routes from the sixth floor — an external fire escape and an interior stairway. Due to the many bales of cloth stored in the building, an employee emerging from the freight elevator on the sixth floor could only walk down one small aisle that ran about halfway across the floor. The fifth floor was similarly stocked and also had an aisle which ran about one half to two thirds of the way across the floor. The aisle on the fifth floor stopped at a point parallel to the beginning of an open stairway which connected the fifth and fourth floors. Access to the fire escape required passage through those blocked aisles. On the fourth and fifth floors the exits onto the fire escape were entirely hidden by the stored material, while on the sixth floor the top of the exit door could just barely be seen between the bales of material piled high to the ceiling. The fire escape was so blocked off that all but one of the employees who testified before the Grand Jury stated that they were not even aware that a fire escape existed.

According to the employees, the defendants did little to apprise them of the existence of the fire escape. In fact, most of the employees who appeared before the Grand Jury testified that they received no instructions whatever concerning steps to be taken in case of a fire. The testimony of the witnesses differed as to the existence of fire exit signs. While the manager testified that there were painted fire exit signs on every floor, and one employee recalled seeing such signs by the elevator, another employee only recalled seeing such a sign on the first floor. The fire marshall who inspected the building after the fire said he saw possibly one such sign. There were no lighted exit signs on the premises, and the fifth and sixth floors contained no overhead lights. While the internal stairway was equipped with fireproof self-closing doors, an inspection after the fire

revealed that those doors had been propped open and the self-closing mechanisms rendered inoperable. Furthermore, the door to the outside at the bottom of the stairway had been chained and locked from the outside.

Although the manager testified that the freight elevator door on one floor could not be opened unless the doors on the other floors were closed, the testimony of several employees revealed that it was common practice to leave the elevator doors open on the various floors simultaneously. In fact, the fire marshall's investigation after the fire revealed that only on the second floor was the elevator door closed. The doors on the first and sixth floors were completely open and the doors on the other floors were partially open. Further, the two building inspectors testified that the elevator's ability to move from a floor with the elevator door open constituted a violation of the New York City Administrative Code and that the corporation had received notice of such violation over two years prior to the fire. The testimony before the Grand Jury also revealed that, in addition to being packed with highly flammable material, the warehouse contained numerous openings through which a fire could easily spread. For example, there were several shafts with openings onto each floor (including the elevator and internal stairway with their open doors) and many other openings between the several floors such as the open stairway between the fifth and fourth floors. With respect to the presence of fire control equipment, the warehouse contained no sprinkler system. The fire chief testified that a fire department building inspector would have recommended that a sprinkler system be installed at the warehouse. Unfortunately, however, because the fire department listed the warehouse as vacant, it did not inspect the warehouse prior to the fire. While some employees testified that there were a number of fire extinguishers throughout the warehouse, others had not noticed any extinguishers and the fire marshall "did not see too many of them".

Further testimony indicated that although the warehouse was equipped with a standpipe system it had deteriorated to a state of uselessness and that Zalman Deitsch and the corporation had been notified by the fire depart-

ment in 1976 and 1978 that the system had to be put into operating condition.

According to the witnesses' testimony, on the day of the fire a shipment of elastic material was delivered to the warehouse. The material was loaded onto the freight elevator by the deceased, Nathaniel Logan, together with his coworkers, Gerald Williams and Raymond Stanley. At the direction of defendant Baruch Scher, Stanley and Logan took the material up to the sixth floor and began storing it on that floor, while Williams remained at work on the first floor.

Shortly thereafter, one of the Deitsch brothers approached the employees on the first floor and began yelling, "Fire, fire. Everybody out." Williams and the other employees on the first floor evacuated the premises immediately. As they did so, Williams saw the fire burning on the first floor. He also noticed at that time that the elevator door on the first floor had been left open.

According to Stanley, while he and Logan were unloading the elevator on the sixth floor, Logan indicated that he smelled smoke. At first Stanley smelled nothing and they continued their work. Soon thereafter Stanley too began to smell smoke and then he heard people outside yelling "fire". Logan went down the interior stairway almost to the fifth floor, looked out a window, and called to Stanley. When Stanley joined him, he saw flames coming out the window on the ground floor.

The two men then ran back up the interior staircase to the sixth floor. When they went to a sixth floor window to get some air, the foreman, who was down on the street, yelled for them to go to the roof. They returned to the fifth floor in the interior staircase, however, and stayed at that location. The smoke prevented them from seeing down the staircase and from going any further. Since they were unable to open the fifth floor window, Stanley broke it with his hands, cutting himself. Stanley was one of those employees who had not known that there were any fire escapes or fire exits in the building; no one had told him that the building had such facilities. He testified that even had he known of a fire escape exit on the sixth floor, he would not have been able to reach it as it was blocked with

bales of material. Stanley did recall seeing the top of a door (which he later learned was a fire exit door) on the sixth floor blocked by the bales of stored materials.

The other employees who had fled the building testified that they could see and hear Logan and Stanley and even tried, unsuccessfully, to reach them with a ladder. Firemen began to arrive at the scene about five minutes after the first floor of the warehouse was evacuated. Over 100 firemen were required to bring the fire, which continued to burn for several days, under control.

Although there was thick, heavy smoke pouring out of the warehouse, Logan and Stanley could be seen intermittently from the street when the wind blew the smoke away from them. Throughout, Stanley yelled and waved so that the firemen could locate them. Logan had been yelling prior to the firemen's arrival, but then had fallen silent. Two firemen ascended an aerial ladder and pulled Stanley out of the window. Stanley's condition led the firemen to believe he was dead until three quarters of the way down the ladder when he began to talk.

There were difficulties, however, in removing Logan. He was stuck in the steel window frame through which he had been leaning and, as he was unconscious, he could not help the firemen extricate him. One fireman tried talking to Logan but got no response. Logan had no pulse. In all, it took 5 to 10 minutes for the firemen to free Logan from the frame and pull him out the window. When Logan was finally brought down to the street, cardiopulmonary resuscitation was applied but there was no response. He was taken to a hospital but there was nothing that could be done for him. An autopsy conducted the following day revealed that Logan died from asphyxia by smoke inhalation.

Several days later, Fire Marshall William McKinney inspected the premises. He testified that he was unable to ascertain the cause of the fire, but discovered that it began on the first floor, with the heaviest burning occurring on the first, second and sixth floors. He explained this pattern by noting that superheated gases rose to the sixth floor through open shafts, encountered the roof, then banked down and set fire to the sixth floor material. It was his

conclusion that the open shafts, stairwells and elevator doors immensely aided the acceleration and spread of the fire.

The evidence presented to the Grand Jury clearly supports the conclusion that the individual defendants who were responsible for the daily supervision of the premises were responsible for the conditions which existed in the warehouse. In addition, the evidence also supports the conclusion that the three individual defendants were high managerial agents of Deitsch Textile Corporation, acting within the scope of their employment and in behalf of the corporation in supervising the warehouse, thus subjecting the corporation itself to possible criminal liability (Penal Law, § 20.20, subd 2, par [b]).

The more difficult question, however, arises with regard to whether the defendants' conduct constituted a *"sufficiently direct cause* of the ensuing death" (*People v Kibbe,* 35 NY2d 407, 413), so as to justify the imposition of criminal liability. It is well established that: "A distance separates the negligence which renders one criminally liable from that which establishes civil liability" (*People v Rosenheimer,* 209 NY 115, 123; *People v Warner-Lambert Co.,* 51 NY2d 295, 306, *supra*), due principally to the fact that in a criminal action "the standard or measure of persuasion by which the prosecution must convince the trier of all the essential elements of the crime charged, is beyond a reasonable doubt" (*People v Kibbe, supra,* p 412). Thus, "defendants should not be found guilty unless their conduct 'was a cause of death sufficiently direct as to meet the requirements of the *criminal,* and not the *tort,* law'" (*People v Kibbe, supra,* p 412; *People v Warner-Lambert Co., supra,* p 306).

In *People v Warner-Lambert Co. (supra),* upon which Criminal Term relied, the Court of Appeals dismissed an indictment charging a corporate defendant and individual defendants with manslaughter in the second degree and criminally negligent homicide where an explosion in one of the corporate defendant's plants used for the manufacture of chewing gum resulted in the death of six employees. The court found (p 304) that although the defendants were aware of a broad, undifferentiated risk of explosion in their

factory as a result of the procedures utilized in manufacturing chewing gum, criminal liability could not attach since the triggering cause of the explosion, as to which the evidence was "hypothetical and speculative", was neither foreseen nor foreseeable. The case at bar, however, is fundamentally distinct from *Warner-Lambert (supra)*. In the instant case the theory of the prosecution is not that the defendants caused the fire which resulted in Logan's death. Rather, the prosecution is predicated upon the theory that defendants created conditions in the warehouse which they should have foreseen could result in death in the event of a fire. This case bears more of a resemblance to *People v Kibbe (supra)* than it does to *Warner-Lambert (supra)*. In *Kibbe (supra)*, the defendants were found guilty of homicide after they abandoned their helplessly intoxicated robbery victim on an unlit road at night, and he was shortly thereafter struck and killed by a passing motorist. While recognizing that the defendants could not be found guilty unless their conduct was a sufficiently direct cause of death so as to meet the requirements of criminal law, the court stated that (p 412): "to be a sufficiently direct cause of death so as to warrant the imposition of a criminal penalty * * * it is not necessary that the ultimate harm be intended by the actor. It will suffice if it can be said beyond a reasonable doubt * * * that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused. (1 Wharton, Criminal Law Procedure, § 169.)" Thus, the court held that by creating the circumstances that led to death by a foreseeable intervening event, the defendants caused death in a sufficiently direct manner to warrant imposing criminal liability (*People v Kibbe, supra;* see, also, *People v Warner-Lambert Co., supra,* pp 306-307). Similarly, in the instant case, the Grand Jury might well have concluded that defendants created unsafe conditions in the warehouse which led to Logan's death by a foreseeable intervening cause — the fire.

The evidence before the Grand Jury similarly could lead to the conclusion that defendants' conduct resulted in the blocking of the means of escape in the event of a fire. The fire escapes on the fifth and sixth floors were completely

blocked by bales of material. Although the interior stairway had been equipped with fireproof, self-closing doors, these doors were rendered ineffective since they were propped open. Thus, the stairway acted as the conduit for the smoke and was rendered unusable. In addition, as noted, the door at the stairway's bottom was chained and locked from the outside and would have been of no use to the trapped employees even if they had been able to descend the stairway. Although the corporation had been notified that the elevator's ability to move with the door open constituted a violation of the New York City Administrative Code, the elevator doors had been left open, thus turning the elevator shaft as well into a conduit for the smoke. The standpipe system was inoperable despite prior notification that the system had to be repaired. Thus, the Grand Jury could readily have concluded that in a warehouse filled with flammable material and honeycombed with various shafts and openings, the blocking of the fire escapes and the improper maintenance of the internal stairway and elevator rendered them unusable when the fire occurred, thus preventing Logan from escaping. Although Logan's death obviously was caused by the fire combined with the unsafe conditions in the warehouse, the defendants cannot escape liability simply because those unsafe conditions were not the sole cause of death (*People v Cicchetti,* 44 NY2d 803). We can see no bar to the imposition of criminal liability for deaths caused by a fire upon one who maintains what is, in effect, a fire trap, no matter what the cause of the fire (see *People v Nelson,* 309 NY 231; *People v Harris,* 74 Misc 353 [the infamous Triangle fire]; see, also, *Commonwealth v Welansky,* 316 Mass 383 [the Cocoanut Grove fire]).

Regardless of whether the evidence would support the conclusion that defendants were actually aware of and consciously disregarded the risk of deaths, there was at the very least sufficient evidence to establish prima facie that by their conduct defendants failed to perceive "a substantial and unjustifiable risk" that deaths might occur and that the risk was "of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in

the situation". Thus, the evidence is sufficient to establish a prima facie case of criminally negligent homicide. And, as previously indicated, once the charge of criminally negligent homicide is sustained, reinstatement of the offense of manslaughter in the second degree is required as well (*People v Leichtweis,* 59 AD2d 383, *supra; People v Maier,* 72 AD2d 754, *supra*).

Finally, it is our view that the charge of reckless endangerment in the first degree must also be reinstated. The evidence set forth above establishes prima facie that defendants "recklessly engage[d] in conduct which create[d] a substantial risk of serious physical injury" to the warehouse employees, thus supporting the lesser included charge of reckless endangerment in the second degree (Penal Law, § 120.20). Therefore, it is not necessary to determine whether defendants' conduct evinced the "depraved indifference to human life" required for a charge of reckless endangerment in the first degree (Penal Law, § 120.25).

Accordingly, we conclude that Criminal Term's order must be reversed and the indictment reinstated.

MANGANO, J. P., O'CONNOR and RUBIN, JJ., concur.

Order of the Supreme Court, Kings County, dated May 29, 1981, reversed, on the law, indictment reinstated and matter remitted to Criminal Term for further proceedings.