*1023 OPINION OF THE COURT
William J. Burke, J.
The defendant has made an omnibus criminal motion, and this decision is being written in order to decide certain issues not heretofore ruled upon at the oral argument of the instant motion.
The defendant has made a motion to inspect the Grand Jury minutes and to dismiss the indictment upon various alleged grounds relating to allegations that said minutes are legally insufficient to support the various counts charged in this indictment. Briefly, the defendant contends that the factual predicate for these charges occurred under circumstances constituting an "industrial homicide” and in the context of this case the proof before the Grand Jury failed to establish by legally sufficient evidence that the defendant’s alleged acts caused the death of Carl Witheral, Sr.
More specifically, the defendant contends that the facts of the case present a "speculative chain of causation”, and further that the apparent ultimate cause of the decedent’s death, the accidental mixing of hazardous chemicals which produced a poisonous gas, was not an event that the defendant could have reasonably foreseen.
Upon a motion to inspect the Grand Jury minutes and dismiss the indictment, the court must examine these minutes in order to determine whether there was competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof. (See, People v Warner-Lambert Co., 51 NY2d 295, 298; People v Forde, 153 AD2d 466.) In the context of the Grand Jury proceedings, legally sufficient means prima facie evidence, not proof beyond a reasonable doubt. (See, People v Mayo, 36 NY2d 1002; People v Brewster, 100 AD2d 134, 139-141, affd 63 NY2d 419; People v McCarter, 97 AD2d 852; People v Puma, 97 AD2d 740.)
In evaluating the sufficiency of the evidence considered by the Grand Jury as presented by the People, the court is required to determine whether the evidence viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant a conviction by a petit jury. (See, People v Nunez-Mezon, 168 AD2d 991 [4th Dept 1990].) The motion should be granted upon a clear showing of insufficiency with the burden of proof resting on the defendant. (People v Howell, 3 NY2d 672, 675.)
*1024 Measured by the foregoing propositions, the court finds that the evidence before the Grand Jury was legally sufficient to establish that the defendant knowingly participated in the illegal removal of certain hazardous chemicals. That the defendant was advised that certain of the chemicals stored at the Colfax Street property in Rochester, New York, were "corrosive” and "hazardous”.
Recognizing the potential danger involved in the purchase of this property the defendant contacted an environmental engineering firm in order to conduct an environmental audit. During the course of the defendant’s "walk thru” with Arpad Kolozsvary on December 19, 1990, the director of environmental services for Passero Associates, "Passera” observed in the presence of James Polvino a variety of drums and bags located within the building itself. Some of the drums had the words sodium sulfide and sodium hydroxide written on them. Mr. Kolozsvary indicated to James Polvino that the drums observed within the building would have to be tested, and that his liability would be significant, depending upon the results of those tests. Mr. Polvino was advised that "Passera” does audits, and that a subcontractor specializing in the area of identifying and transporting the materials to appropriate facilities would have to be hired. On January 2, 1991 Mr. Kolozsvary indicated to James Polvino that he and A1 Gaines of Northeastern Environmental, a subcontractor specializing in transportation of hazardous materials had made a walk-thru of the premises. Mr. Kolozsvary indicated to Mr. Polvino that he needed the "material safety data sheets” regarding each of the barrels located within the premises. These sheets provide information regarding the hazards, the nature of the chemicals in the particular barrel, its characteristics, and whether it can be stored in the vicinity of other chemicals. Mr. Polvino was also advised that if these sheets were available this would minimize the extra cost from an analytical standpoint relative to the amount of testing required in order to identify the contents of barrels and bags located upon the premises. Mr. Kolozsvary indicated to Mr. Polvino that he had some concern regarding the chemicals stored in the building, and that he specifically indicated to him that they were "hazardous wastes”. Mr. Kolozsvary in early January of 1991 contacted James Polvino, and was told by him to prepare a quote as to what it would cost, to identify the materials in the barrels, and to dispose of them. As a result of this conversation in order to obtain a range of what it would cost, to *1025 identify and dispose of the chemicals, Mr. Kolozsvary obtained a cost estimate from A1 Gaines of Northeast Environmental who had previously made an inspection of the Colfax Street property with Mr. Kolozsvary.
Around January 29, 1991 Mr. Kolozsvary advised James Polvino that in order to do the data sheets on the barrels, including the testing and disposal thereof, it would cost "anywhere from Twelve Thousand Dollars, ($12,000), to as much as Thirty-Five Thousand Dollars, ($35,000).” James Polvino indicated to Mr. Kolozsvary that he would get back to him, however Mr. Polvino never got back to Mr. Kolozsvary. Prior to James Polvino’s conversations with Mr. Kolozsvary, a former employee of the company that had operated a silver-reclamation facility at this location indicated to Mr. Polvino during a walk-thru that some of the chemicals within the barrels were "corrosive”.
A1 Gaines of Northeastern Environmental identified certain of the barrels he observed at the Colfax Street property in December of 1990, as the same barrels depicted in certain photographs taken at the scene where the body of Carl Witheral was discovered. Mr. Gaines identified one of the barrels as a 55-gallon barrel containing an unknown acid. Mr. Gaines testified that he specifically indicated to Arpad Kolozsvary that some of the containers or drums contained hazardous wastes. A former employee of James Polvino testified that he (Polvino) on March 2, 1991 asked him if he knew of any place to get rid of the drums, the former employee stated that he did not know of any place, although he advised James Polvino that it would be illegal "to take them someplace and dump them”. He further advised Mr. Polvino that he would need an EPA permit in order to move or dispose of such barrels. On March 3, 1991 Debra Witheral, the decedent’s ex-wife, was present when Carl Witheral picked up a U-Haul truck that he had rented. Ms. Witheral recalls receiving a call late that Sunday afternoon from a person asking for Carl, this person identified himself as Jim. Later on March 3, 1991 while with Carl Witheral, Brenda Goodnough the decedent’s girlfriend testified that Mr. Witheral was driving a very distinctive colorful U-Haul truck with a Hawaiian design with palm trees, and probably a fish. The truck fitting that description was observed later that evening in Rochester, New York, parked outside the Colfax Street property. Brenda Goodnough also stated that Carl Witheral indicated to her that he was getting paid well, in that he was moving contaminated waste *1026 material. The Grand Jury minutes also reflect reference to Debra Witheral’s phone bill which reflected three calls from her phone to the Rochester phone number listed to Polvino Construction. Carl Witheral was living with his ex-wife Debra during this period of time. In conjunction with this evidence, a phone number index book identified as Carl Witheral’s, listed the number of Polvino Construction.
On March 6, 1991, the body of Carl Witheral was discovered in Cicero, New York, and it has been determined that as a result of the combination of certain of the chemicals originating from the Colfax Street site in Rochester, New York, that hydrogen sulfide gas was produced when the chemical sodium sulfide came in contact with acid to produce the lethal gas hydrogen sulfide. The combination of these chemicals apparently resulted from the accidental spilling of such chemicals by Carl Witheral when unloading the U-Haul truck at the site where his body was found. The body of Carl Witheral was found right next to two barrels that contained these two substances. Mr. Witheral clearly came in direct contact with the "acid” since his clothes and body were badly burned by the acid. Dr. Eric Mitchel testified that exposure to such high levels of hydrogen sulfide gas produced by the acid and sodium sulfide turned the decedent’s lungs into a leathery type consistency which resulted in his death.
Upon review of the entire Grand Jury proceeding, and interpreting such evidence in a light most favorable to the People, the court is of the opinion that the Grand Jury evidence established that the defendant’s actions were a "sufficiently direct cause” of death to subject him to criminal liability. (People v Warner-Lambert Co., 51 NY2d 295, 307, supra; People v Kibbe, 35 NY2d 407, 412.) Contrary to the defendant’s contention, the "ultimate harm” here was something which he should have, under the circumstances, plainly foreseen as being reasonably related to his acts. (People v Kibbe, supra; Matter of Anthony M., 63 NY2d 270, 280-281; People v Warner-Lambert Co., supra; People v Steward, 40 NY2d 692, 697.)
Under our Penal Law each homicide crime requires proof that the defendant "caused” the death of a person. The standard to be applied in the determination of "causation” is whether defendant’s conduct was a sufficiently direct cause of the death. As the court in People v Kibbe stated (supra, at 412): "[I]t is not necessary that the ultimate harm be intended by the actor. It will suffice * * * that the ultimate harm is *1027 something which should have been foreseen as being reasonably related to the acts of the accused.”
The Court of Appeals in Matter of Anthony M. in commenting upon causation and criminal liability stated (supra, at 280): "For criminal liability to attach, a defendant’s actions must have been an actual contributory cause of death, in the sense that they 'forged a link in the chain of causes which actually brought about the death’ (People v Stewart [supra]). 'An obscure or merely probable connection between an assault and death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide’ (People v Brengard, 265 NY 100, 108). A defendant’s acts need not be the sole cause of death; where the necessary causative link is established, other causes * * * will not relieve the defendant of responsibility for homicide”.
The defendant asserts that the holdings in People v Warner-Lambert Co. (supra) and People v Roth (176 AD2d 1186 [4th Dept 1991]) are applicable to the facts of this case. In Warner-Lambert Co. and People v Roth (supra) it was determined that the Grand Jury minutes were legally insufficient in that criminal liability could not be predicated upon an "explosion”, when the triggering causes of such explosions were neither foreseen nor foreseeable.
In People v Warner-Lambert Co. (supra), the Court of Appeals dismissed an indictment charging a corporate defendant and individual defendants with manslaughter in the second degree and criminally negligent homicide where an explosion in one of the corporate defendants’ plants used for the manufacture of chewing gum resulted in the death of six employees. The court found that although the defendants were aware of a "broad, undifferentiated risk of explosion” in their factory as a result of the procedures utilized in manufacturing chewing gum, criminal liability could not attach since the triggering cause of the explosion, as to which the evidence was "hypothetical and speculative”, was neither foreseen nor foreseeable (supra, at 304). The court in People v Roth (supra) in sustaining a lower court’s dismissal of an indictment upon the alleged insufficiency of the Grand Jury minutes held that the People failed to establish that the actual triggering cause of the explosion was foreseeable.
The court is of the opinion that the factual circumstances of the instant case are fundamentally distinct from Warner-Lambert Co. and Roth (supra). Clearly in both of those cases the *1028 actual event or chain of events which triggered the explosion were characterized as "hypothetical and speculative”. The cause of death as set forth in this presentment was neither hypothetical nor speculative. Additionally, in each of the aforesaid cases the event which was most likely to have been the actual immediate triggering cause of the respective explosions were themselves determined to be of a kind that the defendants could not have reasonably foreseen. Thus, to be held criminally liable the criminal law requires both a finding that the defendant’s actions were a sufficiently direct cause of the ensuing death, and that the chain of events that followed such conduct and which occasioned the death were of a kind and nature to be reasonably foreseeable by the defendant. The instant case is more closely analogous of the cases of People v Reyes (75 NY2d 590) and People v Kibbe (supra), rather than the Warner-Lambert Co. and Roth cases cited by the defendant. The prosecution here is predicated upon the theory and the Grand Jury evidence clearly shows that the defendant created a highly dangerous condition which he was aware of, namely, engaging in the illegal transportation of "hazardous waste” without having specifically identified each of the chemicals and substances to be transported. Moreover, the Grand Jury evidence further demonstrates that it was certainly reasonably foreseeable that an accidental spill could occur in the course of such dangerous activity which could occasion and create a substantial risk of death by virtue of an unintentional combination of certain of the substances and chemicals. The ultimate harm in the instant case, the production of a lethal gas, was something which should have been foreseen as being reasonably related to the acts of the defendant in engaging a layperson to engage in the highly specialized area of disposing of and transporting hazardous waste.
In Reyes (supra), the Court of Appeals in a case involving the charges of reckless homicide and assault held that the Grand Jury minutes were legally sufficient when the defendant was found to have participated directly in the creation of certain fire-producing conditions. The court held in Reyes (supra, at 593): "that the Grand Jury had enough evidence before it to conclude that defendant participated in the creation of the fire-producing conditions in the building, and that he also failed in his continuing duty as legal owner of the building to eliminate those conditions. It was reasonably foreseeable that the creation and continuance of the danger- *1029 pus conditions presented a substantial and unjustifiable risk of death or injury in a fire.”
The court finds in the context of this Grand Jury presentment that the defendant’s conduct was a sufficiently direct cause of Carl Witheral’s death. Remembering, to be a sufficiently direct cause of death so as to warrant the imposition of criminal liability, it is not necessary that the ultimate harm be intended by the actor (here James Polvino). It will suffice that the Grand Jury evidence established prima facie that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the defendant. There can be no doubt that the defendant’s conduct put in motion a chain of particularized events which resulted in the reasonably foreseeable event that ultimately caused the death of Carl Witheral — the accidental combination of chemicals and substances which produced a deadly gas.
The court finds that the Grand Jury minutes are legally sufficient to support a prima facie finding that the defendant’s conduct constituted the commission of the crime of manslaughter in the second degree. Viewed in the light most favorable to the prosecutor, there was legally sufficient evidence regarding the defendant’s conduct demonstrating that James Polvino was aware of and consciously disregarded a substantial and unjustifiable risk that a death could occur and that such risk of death was of a nature and degree that disregard thereof constituted a gross deviation from the standard of care that a reasonable person would have observed in the situation. The evidence clearly demonstrates that the defendant made a conscious choice to illegally transport "hazardous waste” after having been made aware that certain of the barrels contained hazardous waste and that the exact identity of all the substances and chemicals at the Colfax Street site had to be made prior to the safe transportation and disposal thereof.
The term "recklessly” is a defined culpable mental state. For manslaughter, there must exist a substantial and unjustified risk that death will result; the risk must constitute a gross deviation from the standard of care that a reasonable person would observe in the situation; the defendant must be aware of that risk and consciously disregard it; and the death of a human being must result. (See, People v Licitra, 47 NY2d 554; People v Cruciani, 36 NY2d 304.)
In People v Boutin (75 NY2d 692, 696) the Court of Appeals *1030 has held that reckless manslaughter requires a finding of some culpable "risk creation”. The defendant must be found to have engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of death. The evidence presented to the Grand Jury substantiates that the defendant did engage in some blameworthy conduct creating a substantial and unjustified risk of death. The defendant actually participated in the plan to illegally dispose of "hazardous waste” knowing that some of the substances had been described as constituting a "hazardous waste” and that the identities of the majority of the other chemicals and substances were unknown and that testing thereof was required in order to prepare material safety data sheets to facilitate the proper and safe transportation and disposal of such chemicals and substances. The defendant was aware from the initial stages of this transaction to purchase the Colfax Street site, that there were serious environmental concerns with the site at large and with the building contents themselves. The defendant was aware from a walk-thru of the premises that the building contained numerous barrels and bags, some of which had been described by a former employee of the plant as "corrosive”. He was aware of the need and necessity of conducting an environmental audit of the premises, and in furtherance thereof hired an environmental engineering firm to perform the audit. He was aware as a result of the inspection of the premises with the environmental specialist that in his expert opinion some of the barrels contained "hazardous waste”. He was aware that the contents of the barrels needed to be tested in order to prepare material safety data sheets for the purpose of providing the exact information regarding the contents thereof in order to safely transport and dispose of such substances and materials. He was aware that a subcontractor specializing in the transportation of hazardous waste had been contacted in order to provide a "quote” for the proper and lawful transportation of such chemicals. He was aware when he participated in the plan to illegally dispose of such barrels and bags that it was illegal to do so. He was aware that neither he nor Carl Witheral had obtained an EPA permit authorizing the transportation and disposing of such chemicals. He was aware that Carl Witheral was not an authorized subcontractor specializing in the handling of hazardous waste. He was aware that it was expensive to test, transport and dispose of hazardous waste by firms specializing in such areas. He was aware that he did not contact his environmental *1031 engineer in order to provide the material safety data sheets or to authorize the testing of the barrels and substances. He was aware of and consciously disregarded the substantial and unjustifiable risk that death could occur by participating in the transportation and disposing of such chemicals and substances by a person who was clearly not a specialized subcontractor in the area of environmental remediation. The disregarding of the risks presented by such unlawful handling of these substances constituted a gross deviation from the standard of care that a reasonable person would have observed in this situation. The defendant suggests in part that the defendant’s conduct did not constitute "reckless conduct”, in that the defendant was not aware of the risk that death could occur from the inhalation of hydrogen sulfide gas, in that such gas was not one of the substances which Carl Witheral was hired to transport. The court is of the opinion it is for this very reason that the defendant’s conduct was "reckless”. The defendant was clearly aware that the unknown chemicals and substances needed to be tested in order to properly and safely transport and dispose of such chemicals and substances. However, despite such knowledge and awareness he consciously disregarded the risks associated therewith and hired someone to transport and dispose of these chemicals without such testing. The material safety data sheets could have supplied the necessary information regarding the potential for the production of "hydrogen sulfide gas” if the chemicals had been identified prior to such transportation and disposition.
Certainly neither the criminal law nor the court can countenance the defendant’s assertion that he was not aware of the risk of death, or that the cause of death was not reasonably foreseeable, when it was the defendant himself who knowingly and intentionally failed to authorize such testing, and that by virtue thereof he consciously disregarded the risk that death could occur in the course of the transportation of such hazardous waste and unknown chemicals and substances. If the defendant could be relieved of such criminal liability under this theory, it would certainly constitute an incentive to anyone concerned with the disposition of unknown chemicals and substances not to conduct any tests.
In any event, the court finds that the Grand Jury minutes meet the requirements of CPL 190.65 (1) and that such minutes are legally sufficient with respect to the charge of manslaughter in the second degree and are also legally sufficient *1032 with respect to each and every other count charged in this indictment.
Relative to the defendant’s argument that the defendant was statutorily exempted from being convicted of manslaughter in the second degree and assault in the second degree, the court finds such argument to be without merit. In People v Brathwaite (63 NY2d 839) the Court of Appeals clearly held that a defendant may be convicted of the depraved murder of his accomplice during the course of an armed robbery. (See also, People v Galle, 77 NY2d 953.)
Additionally, the defendant’s assertion that ECL 71-2713 (1) and (4) and ECL 71-2714 (1) and (2) are lesser included crimes of manslaughter in the second degree and that by virtue of certain statutory exclusions regarding liability for injuries to participants, contained in the statutory definition of such crimes, the defendant cannot be guilty of the higher crime of manslaughter in the second degree is without merit. First of all, the aforesaid ECL sections are not charged in the instant indictment, and even if they were such charges do not constitute in any event lesser included charges of manslaughter in the second degree. (See, CPL 1.20 [37]; People v Glover, 57 NY2d 61.)
Lastly, the court finds that the testimony provided by Brenda Goodnough regarding certain alleged admissions made to her by Carl Witheral constituted legally competent and admissible evidence. (See, People v Settles, 46 NY2d 154; People v Maerling, 46 NY2d 289; People v Brensic, 70 NY2d 9; Richardson, Evidence § 260 [Prince 10th ed].)
Therefore, the motion to dismiss the instant indictment is denied.