OPINION OF THE COURT
Harold J. Rothwax, J.
The defendant New York corporation is owned and run by the individual defendants for the retail sale of luxury furs from a location in the County of New York. The indictment charges the defendants with conspiracy (Penal Law § 105.05 [1]) to falsify business records of the corporation, and with falsification of such records (Penal Law § 175.10) in order to conceal the commission of the crime of offering false sales tax returns for filing (Penal Law § 175.35). This alleged scheme is based upon the false use of out-of-State addresses purported to be the shipping destination of furs actually sold and carried from the premises in order to avoid the sales tax that is imposed on local retail transactions.
The evidence before the Grand Jury viewed most favorably to the People (People v Warner-Lambert Co., 51 NY2d 295, 304 [1980]) established that in the course of their retail fur trade, the defendants would solicit out-of-State addresses from customers as a means of encouraging purchases by discounting the amount of sales tax that would ordinarily be owed on an intrastate transaction (Tax Law § 1131 [4]; 20 NYCRR 527.1 [a] [6]). The evidence further established that the defendants would solicit old cloth coats or other heavy items from customers to mail to out-of-State addresses in place of the furs that the customers would take with them from the premises. In order to disguise this practice in sales records, the defendants or others at their direction would substitute on invoices as the *470 true purchaser the name and address of the out-of-State recipient of the substituted item. Consequently, the invoice, bill or receipt would not reflect (as the law required) that the transaction was subject to sales tax in a specified amount (Tax Law § 1132 [a]; Tax Law former § 1145 [b], repealed L 1985, ch 65, § 33; Tax Law § 1817 [g] [2]). The fictitious purchaser, address and purported tax exemption would then be recorded on the books of the corporation subject to examination by tax auditors. The excluded sales would result in a knowing underreporting of the gross sales subject to taxation on the corporation’s quarterly sales tax returns (Tax Law § 1136).
Consequently, the indictment charges, with respect to each of 164 sales that the defendants made in which the invoice was completed as described, that there was a false entry of the address of the purchaser (counts 1-164); an omission to enter the sales tax owed in violation of a duty imposed by law (counts 165-328); the omission of a true entry of the actual address of the purchaser (counts 329-492); and the entry of false addresses and unwarranted sales tax exemptions on the corporate ledger subject to inspection by tax auditors (counts 493-656). These are the counts of falsifying business records (Penal Law § 175.05 [1], [3], [4]) raised to the first degree (Penal Law § 175.10) by the alleged intent to defraud the State of sales tax revenue by concealing commission of the crimes of willfully failing to collect sales tax (Tax Law former § 1145 [b]) and of offering false sales tax returns for filing (Penal Law § 175.35) (counts 657-671).
EQUAL PROTECTION
The court does not find the legislative distinction between taxpayers whose delinquencies came to light before the effective date of the amnesty statute (L 1985, ch 66, § 1) and those whose delinquencies were revealed only in exchange for amnesty violative of equal protection of the law to those taxpayers who were excluded from the benefits of amnesty.
In April 1985, the State Legislature granted to the State Tax Commission authority to establish "a three month amnesty program to be effective during the fiscal year ending March thirty-first, nineteen hundred eighty-six”, which would exempt "from civil, administrative or criminal action” taxpayers (including corporations employing fewer than 500 people in the United States), who had incurred tax liabilities for "transactions * * * occurring prior to January first, nineteen *471 hundred eighty-five” (L 1985, ch 66, § 1 [a], [b]). Amnesty was made conditional upon the completion of a written application by the taxpayer designating the taxes and taxable period for which exemption was sought, and upon payment in full of all such taxes and interest accrued. The enactment excluded "any taxpayer who is a party to any criminal investigation being conducted by an agency of the state or any political subdivision thereof or to * * * criminal litigation which is pending on the date of the taxpayer’s application in any court * * * for nonpayment, delinquency or fraud in relation to any of the designated taxes” (L 1985, ch 66, § 1 [c]). The Tax Commission decided to implement the amnesty during the period November 1, 1985 until January 31, 1986. Taxpayers who filed for amnesty prior to November 1 were processed as if they had applied on the first day. In publications issued by the Commission, in news releases, and on the amnesty application form itself, applicants were advised that "tax liabilities related to a criminal investigation in progress * * * to a pending criminal proceeding, or resulting in a criminal conviction” were not covered and that as to such liabilities taxpayers were ineligible.
Regulations adopted by the Commission provided for compilation of a confidential list of taxpayers ineligible because they were under criminal investigation relating directly to any covered taxes, and for a mechanism by which potential applicants could learn whether they were under investigation and, hence, ineligible. (20 NYCRR 2500.4 [b] [1].) An applicant was required to certify eligibility for amnesty in accordance with these conditions. In the event an applicant was rejected as being subject to criminal investigation, the regulations provided that upon a subsequent finding of no criminal liability the applicant could resubmit the application for amnesty from civil penalties. (20 NYCRR 2500.4 [b] [4] [iii].) A taxpayer against whom an indictment had been filed as of the date of the application was deemed ineligible for amnesty altogether, apparently regardless of the outcome of the criminal proceeding, and continues to be liable for civil penalties in spite of timely application and subsequent acquittal. (20 NYCRR 2500.4 [c].)
There is no dispute that the defendants were under investigation for failure to collect or remit sales tax on the transactions at issue here, as of the date the amnesty statute was enacted. The Grand Jury began hearing evidence on these allegations in July 1985 and the instant indictment was filed *472 on August 5, 1985 or three months prior to the effective date of the amnesty program. Hence, the defendants were specifically excluded by the statute from the benefits of amnesty from criminal prosecution and, by regulation, from amnesty for civil penalties. In December 1985 the defendants nonetheless certified their eligibility for amnesty and paid almost $90,000 in sales tax and interest accrued from June 1980 through February 1984. In accordance with Tax Commission regulations, the payment was accepted "as if * * * received apart from an amnesty application” (20 NYCRR 2500.4 [c] [3] [ÜP.
The defendants now contend that the statutory exclusion of tax liabilities under criminal investigation, and the regulatory exclusion of taxpayers under indictment as to such liabilities prior to the effective date of the program, created a distinction based upon the assertedly fortuitous circumstance of when the taxpayer’s delinquencies became known to the authorities. Before considering this argument, it is important to note that insofar as the criminal prosecution is the only proceeding before this court, there is no issue here regarding the distinction between taxpayers under investigation and those under indictment, as to continued eligibility for amnesty from civil penalties in the event of acquittal.
The defendants contend that granting amnesty only to those taxpayers whose delinquencies were unknown until revealed in their applications bears no relation to the State’s objective to raise revenue or, if it does bear some relation, it is the same with regard to taxpayers whose delinquencies are under investigation. Specifically, the defendants assert that if the objective is to induce payment by an exchange of amnesty from prosecution, then the inducement is equally compelling to anyone who has not been convicted, and that to distinguish those whose delinquencies came to light before the effective date of the program from those whose delinquencies were discovered subsequently, is arbitrary and a violation of the equal protection of law to those who are excluded. (US Const 14th Amend; NY Const, art I, § 11.) The argument, in short, is that the statutory classification of those eligible for amnesty is underinclusive. (See, e.g., LaFave and Scott, Criminal Law, ch 2, § 19, Equal Protection, at 132 [1972 ed].) The defendants seek to have the benefit of the amnesty program extended to all taxpayers who complied with the disclosure and payment conditions, regardless of their status as targets of an investigation or Grand Jury proceeding, or as defendants under a *473 pending indictment for violating the tax laws. (Compare, People v Liberta, 64 NY2d 152, 170-171 [1984].)
The nature of the classification alone does not violate equal protection standards. The classification is neither based upon suspect criteria nor is there any fundamental right to avoid prosecution for a crime (cf., e.g., Yick Wo v Hopkins, 118 US 356 [1886]; People v Liberta, 64 NY2d, at pp 167-170; see, Oyler v Boles, 368 US 448, 456 [1962]). Thus, the classification is subject to a rational basis standard of review. (See, e.g., Maresca v Cuomo, 64 NY2d 242, 250 [1984].)
The Legislature may permissibly enact penal statutes of general application and then exempt certain groups or activities from prosecution, as long as the statutory immunity bears some rational relationship to the achievement of a legitimate State purpose (McGowan v Maryland, 366 US 420, 425 [1961]; People v Illardo, 48 NY2d 408, 417-418 [1979]). The standards under which such statutory exemptions are measured are the same under the Federal and State Constitutions: "[A] legislative enactment will pass constitutional muster if the governmental classification is based upon some conceivable and legitimate State interest * * * If any conceivable state of facts will support the classification, said provisions will not be held violative of the equal protection clause * * * 'Legislative enactments . . . are presumed to be supported by facts known to the Legislature * * * While this presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt’ * * * The legitimate purpose justifying the provision need not be the primary purpose of the provisions (McGinnis v Royster, 410 US 263, 276) and, indeed, a court may even hypothesize the motivations of the State Legislature to discern any conceivable legitimate objective promoted by the provision under attack (Weinberger v Salfi, 422 US 749, 780).” (Maresca v Cuomo, 64 NY2d, at pp 250-251; compare, McGowan v Maryland, 366 US, at pp 425-426; People v Illardo, supra, at pp 417-418.)
While it may be true in the narrowest sense that these defendants were situated, with respect to the revenue raising purpose of the amnesty program, similarly to all other taxpayers who had not paid past taxes, they were not so situated with respect to other purposes of the tax laws. The State’s interest in punishing those who willfully avoid paying taxes is an equally significant and indeed necessary ancillary to the collection of revenue. (See, e.g., Matter of New York State Dept. of Taxation & Fin. v New York State Dept. of Law, 44 *474 NY2d 575, 580-581 [1978]; compare, United States v Hubbard, 686 F2d 955, 960, n 18 [DC Cir 1982]; United States v Chapman, 559 F2d 402, 407 [5th Cir 1977]; Phillips v Commissioner, 283 US 589, 596 [1931].) The amnesty program created a limited exception to the punitive aspect of the statutes in order to further revenue raising by encouraging such persons who had evaded paying taxes without detection by the State prior to November 1, 1985, to admit their nonfeasance and to pay up. Those taxpayers who had not complied with the conditions of amnesty as of January 31, 1986 but continued to violate the revenue laws remain subject to prosecution to the same degree as those who had violated the law prior to initiation of the amnesty program. In other words, the measure was extraordinary.
Ordinarily, the threat of penal sanctions is adequate to compel the payment of taxes. Such compulsion would certainly be ineffective if the penal sanctions were never enforced. (See, State Dept. of Taxation & Fin. v State Dept. of Law, supra, at p 580.) Where, as in the case of these defendants, the evasion has been discovered and penal sanctions may be imposed, both the revenue and punitive purposes of the statutes are met and no further legislative remedy is required.
In this instance, the Legislature apparently perceived that the existing sanctions were not sufficiently compelling to generate full or even satisfactory compliance with the tax laws. In order to remedy this perceived evil, the Legislature enacted a comprehensive revision of the tax laws to increase criminal and civil penalties for noncompliance (Omnibus Tax Equity and Enforcement Act [L 1985, ch 65]). At the same time, the Legislature was apparently concerned that publicity intended to generate greater compliance with tax laws in the future by informing the public about the stricter penalties, would result in the loss of all unpaid tax revenues that normal investigative means had not disclosed, by completely discouraging voluntary belated compliance. Therefore, consistent with the purpose to generate as much revenue as possible, the State adopted the amnesty program, and, so as not to undermine the effectiveness of the coercive aspects of the tax laws, limited the amnesty to such taxpayers as had successfully evaded the enforcement mechanism of the law prior to implementation of harsher measures. Thus, the statutory classifications bore a rational relation to both purposes of the *475 tax laws. (See, e.g., Marshall v United States, 414 US 417, 423-424 [1974].)
Even though the statutory classifications relate to legitimate objectives, the means used to attain the objectives may nonetheless be overbroad, underinclusive or otherwise irrational. (See, City of Duluth v Sarette, 283 NW2d 533, 535-536 [Minn 1979]; compare, State v Burgun, 49 Ohio App 2d 112, 359 NE2d 1018, 1026 [1976], with People v Illardo, 48 NY2d 408, supra.)
The Legislature need not, however, address all aspects of a problem in the same manner, or at the same time, or at all. (Williamson v Lee Opt., 348 US 483, 488-489 [1955].) Here the Legislature chose to address the problem of lost revenues at the expense of full enforcement of penal sanctions. Although amnesty from prosecution for those who had successfully evaded their tax liabilities prior to January 1985 was the means the Legislature chose, it cannot be said that the statute was directed "against” those taxpayers as to whom criminal investigation had commenced. Rather the amnesty represented "a policy choice in an experimental program made by that branch of Government vested with the power to make such choices” (Marshall v United States, 414 US, at p 428). While it is true that the amnesty program unburdens one segment of the taxpaying community without at the same time unburdening others as to whom the threat of prosecution has been realized, the statutory purpose behind the distinction justifies the means used. In other words, in respect to revenue raising, the Legislature did all that was necessary to induce the disclosure of previous nonpayments. Since that purpose is legitimate, and the means were reasonably tailored to suit the purpose, the Legislature was not required to do more. (Developments in the Law — Equal Protection, 82 Harv L Rev 1065, 1085, n 40.)
In fact, identical means have been used in related contexts to attain similar ends consistently with the equal protection clause. A statutory grant of amnesty to a class of persons is a form of immunity like that used in particular cases. (See, Brown v Walker, 161 US 591, 601-602 [1896].) Statutory immunity (CPL 50.10) is routinely granted to some defendants to induce or to compel their testimony, and yet withheld from other defendants, without violating equal protection of the laws. (See, e.g., United States v Dalton, 465 F2d 32, 35 [5th Cir 1972], cert denied 409 US 1062; United States v Graham, 548 F2d 1302, 1315 [8th Cir 1977]; Brown v Parratt, 419 F Supp *476 44, 48, n 3 [US Dist Ct Neb 1976].) The automatic statutory grant of transactional immunity to Grand Jury witnesses (CPL 190.40 [2]) is inapplicable to a Grand Jury witness who has previously pleaded guilty in relation to the criminal transaction about which he is called upon to testify. (People v Sobotker, 61 NY2d 44, 48-49 [1984].) The automatic grant of transactional immunity is justified by the State’s dual interests in obtaining evidence and in maintaining constitutional rights. (People v Williams, 81 AD2d 418, 425 [2d Dept 1981], affd 56 NY2d 916.) Once the witness has acknowledged his guilt, his liberty is forfeit; the State’s need to provide incentives for his evidence is evaporated; and, the equal protection clause notwithstanding, his testimony may be compelled in exchange for nothing more than use immunity. Finally, there is a statute of long standing which is similar to the amnesty statute at issue here in that it confers immunity from prosecution (for criminal possession of a weapon and related crimes) upon anyone "voluntarily surrendering such weapon” to the police under specified conditions. (Penal Law § 265.20 [1] [f]; see, e.g., People v Robbins, 190 Misc 767 [Middletown City Ct 1947].)
In each of the foregoing circumstances, the Legislature has conferred or authorized the conferral of immunity upon a class of persons in order to meet the State’s need to discover evidence or, under Penal Law § 265.20, to remove dangerous illegal articles from circulation. The Constitution is not held to require extension of such immunity to all potential witnesses or possessors of dangerous weapons, because the Legislature is entitled to extend the benefit of immunity only to the extent necessary to attain the evidence, article or, in the instant case, revenue sought and no further. The fact that not all criminals are prosecuted has never been seen as a denial of equal protection of the law to those who are, as long as the distinction has a reasonable basis. (Oyler v Boles, 368 US 448, 456, supra; Wayte v United States, 470 US 598, 607-610 [1985].)
DISCOVERY
The defendants move pursuant to CPL 240.20 (1) (a) and (b) for disclosure of statements made by nondefendant employees of the defendant corporation to law enforcement authorities ([1] [a]) and to the Grand Jury ([1] [b]), claiming that such statements and testimony are statements of the corporate *477 defendant. In support of this branch of their motion, defendants cite People v Leto Bros. (70 Misc 2d 347 [Albany County Ct 1972]). That case, which was decided soon after the adoption of the revised CPL, held only that a corporate defendant, like an individual, was entitled to disclosure of statements made "by such defendant before the grand jury” (CPL former 240.20 [1] [a]). There is no contention otherwise in the instant case. The issue is whether and to what extent statements of corporate employees are statements of the corporate defendant within the meaning of the discovery statute. The defendants argue, in effect, that any employee may speak for the corporation and, therefore, all such testimony is discoverable as of right. The defendants’ position simply finds no support in current law within this jurisdiction. (Cf., e.g., People v Vantage Petroleum Corp., NYLJ, Nov. 13, 1980, p 10, col 5 [Sup Ct, Suffolk County].)
A corporate defendant is entitled to no greater discovery than an individual defendant. Under current statutes, only statements made by the defendant, or a codefendant to be tried jointly, to a public servant engaged in law enforcement or to such person’s agent, or in testimony before the Grand Jury, are discoverable as of right. (Cf., e.g., People v Odierno, 121 Misc 2d 330, 334-335 [Sup Ct, Bronx County 1983]). Such discovery is necessary to enable the individual defendant to assert his privilege against self-incrimination, his right to counsel, his right to exclude unimpeachable hearsay statements of codefendants, and other important interests including freedom from unfair tactical advantage by the surprise use of the defendant’s own words to discredit or convict him. (See, e.g., People v Di Matteo, 80 Misc 2d 1029, 1031 [Sup Ct, Richmond County 1975].) The possibility of tactical advantage is not, however, the determining factor, since not every statement the defendant has made, and no statement made by his unindicted confederates, is available to him as of right. It is his own words to law enforcement officials who, in league with prosecutorial agencies, generally assume an adversarial posture in the subsequent criminal litigation with which the Legislature was primarily concerned. Leaving aside the constitutional questions of voluntariness and of privilege against self-incrimination which are inapplicable to the corporate defendant, such statements generally fall within the definition of evidentiary admissions. (See, McCormick, Evidence § 262, at 630-631 [2d ed 1972].)
The rule of representative admissions recommends itself as *478 the limit of discovery by a corporate defendant of employee statements for several reasons. First, only such employee statements as qualify as representative admissions are admissible in evidence over objection of the corporation. (See, e.g., Loschiavo v Port Auth., 86 AD2d 624, 625 [2d Dept 1982], affd 58 NY2d 1040 [1983].) Second, under current law, “the evidential admissibility of the agent’s statements as admissions of the principal is measured by precisely the same tests as the principal’s substantive responsibility for the acts and conduct of the agent” (McCormick, op. cit., § 267, at 640; cf. Proposed Code of Evidence, art VIII, § 801 [d] [2] [D], and Commentary at 168-170 [West ed 1980]). Thus, whether the acts or words of a corporate employee are binding upon the corporation depends upon proof that the acts were done or words spoken by the agent acting within the scope of his employment, or upon the authority of a high managerial employee acting within the scope of his authority (Penal Law § 20.20 [2] [b], [c]; Richardson, Evidence [Prince 10th ed] § 253). In brief, only statements made by a person authorized to speak for the corporation regarding the subject matter are properly statements of the corporation. (Richardson, op. cit., § 253 [1985 Supp], at 109; Proposed Code of Evidence, op. cit., at 170.) The burden is upon the defendant to show which of its employees were expressly authorized to speak on its behalf to law enforcement agents regarding possible violation of the tax laws.
Similarly, it is entirely consistent with the purpose of CPL 190.50 (5) (a), (b), which allows the target of a Grand Jury investigation to elect to appear and to “furnish the panel with his own version concerning the matters being investigated” (People v Durante, 97 AD2d 851, 852 [2d Dept 1983]), to limit the corporate defendant’s testimony and, hence, discovery, to such person or persons as have specifically been authorized by the corporation to appear and testify on its behalf. Only such person is an agent of the corporation for purposes of the Grand Jury proceeding, and only such agent’s testimony is subsequently binding on the corporation under current law. To allow greater discovery in this context would permit corporate defendants to obtain statements and testimony of witnesses otherwise unavailable to other defendants as at the expense of recognized principles of Grand Jury secrecy. It would also present the danger of intimidation, and of testimony by current employees of the corporation tailored to preserve their jobs rather than to serve the ends of truthful *479 ness. (See, People v Warneck, Sup Ct, NY County, July 23, 1985, Altman, J.)
Since it does not appear that any person was specifically designated to testify on behalf of the corporation before the Grand Jury, discovery is denied as to such statements.