OPINION OF THE COURT
Michael A. Ambrosio, J.
In this case, an all too familiar tragedy raises what is apparently a novel question of law in this state. Can a person be held criminally liable for the unintentional firearm related *413 death of a young child who shoots himself with a gun left by that person in an easily accessible location in his home?
On July 14, 2001, four-year-old Ojagee Heber died as a result of a single gunshot wound to the head. Ojagee accidentally shot himself with an illegal firearm that his uncle, the defendant Wayne Heber, left underneath the cushion of a chair in the living room of his house. As a result of this incident the defendant is charged with manslaughter in the second degree, criminally negligent homicide, reckless endangerment in the second degree, criminal possession of a weapon in the third and fourth degrees, and tampering with physical evidence.
Defendant’s Motion to Dismiss the Indictment
The defendant has filed an omnibus motion seeking various forms of pretrial relief. The defendant moves to dismiss the homicide and reckless endangerment charges contending that the evidence before the grand jury was legally insufficient to support those charges (CPL 210.20 [1] [b]).
The grand jury in this case heard testimony from five witnesses. Renee Heber, Ojagee’s mother testified that on July 10, 2001, she took Ojagee with her to visit her father, Wilson Heber, who was temporarily residing with the defendant after a brief hospitalization. The defendant lives with his wife, Nicole, and his 12-year-old daughter, Erica, in a two-story private house. According to Ms. Heber, Ojagee remained at the defendant’s residence from July 10 up until the time of his death. Ms. Heber paid a brief visit on July 11, and then returned on July 13 to take Ojagee back home. She stayed overnight with Ojagee and her other five-month-old child.
On the evening of July 14, 2001, at approximately 6:00 p.m., Ms. Heber was cooking dinner for Ojagee in the defendant’s kitchen. She asked Ojagee to go into the living room to watch television while she finished cooking. He went into the living room and sat down on a cloth chair directly opposite the television. She was able to see Ojagee from the kitchen. He was sitting alone in the living room facing the television watching cartoons. Ojagee returned to the kitchen shortly thereafter and told Ms. Heber that he was hungry. She asked him to go back into the living room because dinner was not ready. When he returned to the living room, she saw him kneeling on the same chair looking in her direction. Ms. Heber then heard a pop. She immediately ran toward the front door to see where the noise had come from. She glanced over and saw that Ojagee was slumped over in the chair.
*414 The defendant, whom Ms. Heber had last seen standing outside in front of the house about a half hour before the incident, came running into the house. According to Ms. Heber, defendant went over to the chair where the child lay mortally wounded then turned to Ms. Heber and said, “I can’t stay here, I can’t stay here.” (Grand jury minutes, Nov. 20, 2001, at 21.) He then left the residence. Police Officer Thomas Vanschuyler testified that, as the first officer to respond to the scene, he rushed Ojagee in his squad car to Brookdale Hospital where he was pronounced dead.
Wilson Heber, Ojagee’s grandfather, testified that at the time of the incident, he was sitting on the front porch of the house and was able to see the defendant who was sitting in his car. He heard a loud sound then heard someone screaming inside the house. He ran into the living room and saw Ms. Heber placing Ojagee on the floor. He did not notice the defendant enter the house but recalled seeing him a few moments later speaking to Ms. Heber. He overheard the defendant tell her that “he was sorry if [Ojagee] died, and that he had to leave” (grand jury minutes, Nov. 26, 2001, at 12). He then saw the defendant leave the house. Both Ms. Heber and Wilson Heber testified that they didn’t see a gun at the time of the shooting.
Detective Christopher Karolkowski, the detective assigned to investigate this case, testified that he arrived at the defendant’s residence at approximately 7:30 p.m. the night of the incident. He went into the living room and saw a chair facing the television. The cushion to that chair was on the floor. He also noticed a large pool of blood on the right arm of the chair. He recovered a nine-millimeter shell casing from the floor next to the cushion.
On July 15, at approximately 12:15 a.m., the defendant and his attorney, Ed Hammock, arrived at the 69th Precinct. According to Detective Karolkowski, the defendant told him in the presence of his attorney that “he was sorry that this happened and he wanted to rectify it” (grand jury minutes, Nov. 20, 2001, at 36). Detective Karolkowski then asked the defendant where he could find the gun. After briefly speaking to Mr. Hammock, the defendant informed Detective Karolkowski that he placed the gun in a dumpster somewhere in East New York. Ultimately, the defendant led the police to a large dumpster located in front of 529 Sheffield Avenue, Brooklyn, where they recovered the gun in a plastic bag. The defendant told Detective Karolkowski that the gun was no longer loaded, he had taken the magazine out of the gun before placing both items in the plastic bag. The recovered weapon was a nine-millimeter *415 Hi-Point semiautomatic pistol with eight live rounds in the magazine.
The People submitted a ballistics report from Detective Joseph Cummings who examined this weapon. According to the ballistics report, Detective Cummings concluded that the gun and the ammunition were operable. Additionally, Detective Cummings’ report indicated that the weapon had a “light trigger pull.” The “trigger pull” is the amount of strength needed to actually fire the gun, to pull the trigger. According to Detective Cummings, the trigger pull for this particular firearm was 5V2 to 6V2 pounds as compared to the firearms supplied to the New York City Police Department which have a trigger pull anywhere from IIV2 to 12 pounds. The ballistics report also concluded that the nine-millimeter shell casing found in the living room was fired from the weapon recovered from the dumpster.
Finally, Detective Edward Latorres of the crime scene unit testified that he recovered a bullet from the defendant’s attic two floors above the living room which is believed to have been the bullet that killed Ojagee.
Analysis
Many children die each year from unintentional firearm injury.[1] Because of a growing public concern regarding the accidental shootings of children in the homes of gun owners, 18 states have enacted safe storage laws for firearms.[2] Known as *416 Child Access Prevention (CAP) laws, most of the statutes generally make it a crime for a gun owner to store a loaded firearm in a manner in which he knows or reasonably should know a child may gain access to the weapon. If a child does gain access to the gun and uses it to inflict injury or death upon him/herself or another person, the gun owner is held criminally liable. New York currently does not have a CAP law although CAP bills were introduced before the State Assembly and Senate last year (A 5363 and S 728).[3]
Even with the CAP laws, criminal prosecutions are rarely brought against gun owners who have lost a close relative because of an accidental shooting.[4] Prosecutors always have discretion over whether or not to press charges, but in many instances they do not want to aggravate an already tragic situation by commencing a criminal prosecution.[5] Many believe there is no greater punishment than the knowledge that one contributed irresponsibly to the death of a closely-related child. That is not to say that prosecutions do not occur. For example, in March 2000, a Michigan prosecutor brought an involuntary manslaughter charge against a 19-year-old man who left a stolen handgun readily accessible to a six year old who then found the gun and used it to kill a classmate.[6]
The central question of course is whether the defendant in this case may be held criminally liable on the theory of either reckless or negligent conduct for the death of Ojagee under the *417 current penal laws of this state.[7] As previously noted, there are apparently no reported cases in New York State nor have the parties drawn the court’s attention to cases where the relevant statutory provisions were applied to this tragic set of facts.
As a threshold matter, the court is mindful of the standard for judicial scrutiny on a motion to dismiss an indictment for legal insufficiency of the evidence. It is well settled that the court may only grant a motion to dismiss the indictment where “[t]he evidence before the grand jury was not legally sufficient to establish the offense charged or any lesser included offense” (CPL 210.20 [1] [b]). The burden is on the defendant to make a clear showing of legal insufficiency (see, People v Diaz, 201 AD2d 580 [2d Dept 1994]; People v Guzman, 180 AD2d 469 [1st Dept 1992]; People v Yip, 118 AD2d 472 [1st Dept 1986]), and the court must examine the evidence in the light most favorable to the People (see, People v Warner-Lambert Co., 51 NY2d 295, 299). Upon a motion to dismiss for legal insufficiency it must be shown that the People presented a prima facie case. Questions as to the quality or weight of the proof are deferred and the evidence may be legally sufficient even if it does not prove guilt beyond a reasonable doubt (see, People v Jennings, 69 NY2d 103, 115). Finally, “[t]hat other, innocent inferences could possibly be drawn from the facts is irrelevant on this pleading stage inquiry, as long as the Grand Jury could rationally have drawn the guilty inference” (People v Jensen, 86 NY2d 248, 253, citing People v Deegan, 69 NY2d 976, 979).
In People v Haney (30 NY2d 328, 336 n 10) the Court of Appeals noted:
“it must be observed that it is the Grand Jury which is the arbiter of the credibility and the weight to be given to the evidence. As we wrote in People v. Eckert (2 N Y 2d 126, 129): ‘that a trial jury might not convict on this evidence is not our concern. The Legislature has specifically relegated the question of whether a trial jury would return a conviction on this evidence to the judgment of the Grand Jury’. (See, also, People v. Howell, 3 A D 2d 153, 161 n. [Breitel, J.], affd. 3 N Y 2d 672; People *418 v. Vaccarella, 257 App. Div. 461; People v. Bob, 233 App. Div. 94.)”
Bearing these principles in mind, the court must determine whether the defendant has made a clear showing that all the evidence presented to the grand jury, when viewed in the light most favorable to the People, is legally insufficient to support the charges of manslaughter in the second degree, criminally negligent homicide and reckless endangerment in the second degree.
Section 125.15 (1) of the Penal Law provides, in part, that “[a] person is guilty of manslaughter in the second degree when [he] recklessly causes the death of another person.” Subdivision (3) of section 15.05 of the Penal Law defines “reckless” in the following manner:
“A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.”
Section 125.10 of the Penal Law states that “[a] person is guilty of criminally negligent homicide when, with criminal negligence he causes the death of another person.” Subdivision (4) of section 15.05 of the Penal Law defines “criminal negligence” as follows:
“A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would have observed in the situation.”
Section 120.20 of the Penal Law states that “[a] person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.”
The essential distinction between manslaughter in the second degree and criminally negligent homicide is the state of mind of the actor. In the former, the actor is aware of the *419 substantial and unjustifiable risk of death inherent in his acts but consciously chooses to disregard it in a gross deviation from a reasonable standard of care (Penal Law § 15.05 [3]). The latter offense requires the actor to fail to perceive the risk of death inherent in his act and for this failure to constitute a gross deviation from a reasonable standard of care (Penal Law § 15.05 [4]; People v Murphy, 88 AD2d 1000 [2d Dept 1982]). The “underlying conduct” is the same for both crimes. Both felonies require “risk of death inherent in [the defendant’s act]” (People v Boutin, 75 NY2d 692, 696, quoting People v Montanez, 41 NY2d 53).
Criminal liability cannot be predicated on every act of carelessness resulting in death (People v Haney, supra at 333, 335). The carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, the carelessness “must be such that its seriousness would be apparent to anyone who share’s the community’s general sense of right and wrong” (People v Boutin, supra at 696). Criminal negligence thus requires “some serious blameworthiness in the conduct that caused [the death]” (People v Boutin, supra at 696) or some culpable “risk creation” (People v Ricardo B., 73 NY2d 228, 235-236).
It is also essential that the defendant’s conduct must have been a “sufficiently direct cause of the ensuing death” before there can be any imposition of criminal liability (People v Kibbe, 35 NY2d 407, 413 [emphasis added]). Defendant’s actions must have been an actual contributory cause of death, in the sense that they “forged a link in the chain of causes which actually brought about the death” (Matter of Anthony M., 63 NY2d 270, 280, quoting People v Stewart, 40 NY2d 692, 697). It must be shown that the defendant “set * * * in motion the machinery which ultimately results in the victim’s death” (People v Kibbe, 35 NY2d at 412). Direct cause does not mean either “immediate” or “unaided” (People v Stewart, 40 NY2d at 697). Nor need the defendant’s acts “be the sole cause of death” (Matter of Anthony M., 63 NY2d at 280).
The defendant maintains that the grand jury evidence does not support the homicide and reckless endangerment charges because the People have failed to establish a sufficient causal connection between his actions and the death of the child. He contends that Ojagee’s death, albeit tragic, was not a foreseeable consequence of his conduct, nor did his conduct constitute “a gross deviation from the standard of conduct that a reasonable person would have observed in the situation” (Penal Law *420 § 15.05 [3]). In this regard, he notes that he was not present in the home when the accident occurred and had no reason to know that the child was in the living room “unsupervised” at the time of the shooting. He further maintains that he did not have a legal duty of care vis-a-vis the child since he was neither a parent nor care-giver.
The court finds that the People presented ample evidence to establish prima facie proof that the crimes charged have been committed, that is, the grand jury could reasonably conclude that the defendant engaged in conduct that posed a substantial and unjustifiable risk of death, that such conduct constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation, and that his acts were a sufficiently direct cause of Ojagee’s death.
It is a matter of common sense that guns (particularly loaded guns) ought to be placed safely out of the reach of young children. In this case, the defendant, who is a father himself, exercised extremely poor judgment and grossly misused what is undeniably an inherently dangerous instrumentality.[8] Defendant was aware that his four-year-old nephew was staying over at his home for five days prior to the incident. Knowing this, he left a loaded operable illegal nine-millimeter semiautomatic handgun, with a “light trigger pull,” under a chair cushion directly in front of a television. The child did not go searching through drawers or other inaccessible areas to find this weapon. He did not enter other rooms of the house such as the defendant’s bedroom. He did not climb shelves or open closets to find this weapon. Rather, he found the secreted weapon when he did something millions of children do each day, he sat down in front of a television to watch cartoons. This was a most inappropriate location to place this particularly lethal weapon. Additionally, defendant was the only one who was aware that the gun was in the living room and failed to warn anybody about its presence.
On these facts the grand jury could certainly find that the defendant’s level of carelessness constituted “serious blameworthy conduct” and not just mere civil negligence (see, People v *421 Haney, supra). As noted in Haney, the original intent of the Legislature in the creation of the criminal negligence statute was “to stimulate people towards awareness of the potential consequences of their conduct * * * to avoid creating undesirable risks” (30 NY2d at 334; also see, People v Boutin, 75 NY2d at 696). Having a loaded operable illegal gun placed under a chair in front of a television within easy reach of a toddler is obviously a socially “undesirable risk” to be avoided. The potential consequences are self-evident — the tragic death of a child.
The grand jury could also reasonably have concluded that the defendant’s conduct was a “sufficiently direct cause” of death so as to meet the requirements of the criminal law. As stated by the Court of Appeals in People v Kibbe:
“[T]o be a sufficiently direct cause of death so as to warrant the imposition of a criminal penalty * * * it is not necessary that the ultimate harm be intended by the actor. It will suffice if it can be said beyond reasonable doubt that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused (1 Wharton, Criminal Procedure Law, § 169)” (35 NY2d at 412 [emphasis added]).
The defendant set in motion the chain of events which ultimately resulted in the victim’s death. The chain of events was not “an extraordinary coincidence,” nor “hypothetical and speculative” (see, People v Warner-Lambert, 51 NY2d at 304), but were “reasonably related to the acts of the accused” (People v Kibbe, supra at 412). By failing to properly safeguard the loaded gun and leaving it in such a conspicuous place while a four year old was visiting his home, he created the opportunity for the child to obtain and use the firearm in a manner likely to result in his death (see generally, People v Reyes, 75 NY2d 590; People v Deitsch, 97 AD2d 327 [2d Dept 1983]; People v Labar, 221 AD2d 783 [3d Dept 1995]).
Accordingly, the defendant’s motion to dismiss the homicide and reckless endangerment counts is denied in its entirety.
Motion for Suppression
The People intend to offer in their direct case at trial statements that defendant made to a law enforcement officer. The defendant’s attorney, Edward Hammock, claims that when he made arrangements to surrender the defendant, he expressly informed Sergeant Palmieri of the 69th Precinct that the de *422 fendant should not be questioned by the police. According to Mr. Hammock, the defendant arrived to the precinct before Mr. Hammock and was questioned without legal counsel (contrary to Mr. Hammock’s prior direction to the police), and without Miranda warnings. Mr. Hammock also claims that he later agreed to allow the defendant to divulge the whereabouts of the gun only after he “received assurances” (Hammock’s affirmation 20) from the detectives that statements and the physical evidence recovered would not be used against the defendant.
The People claim, on the other hand, that the defendant surrendered himself with Mr. Hammock actually present and agreed to disclose the whereabouts of the gun apparently without any preconditions. Since defendant’s version is disputed by the prosecution, it clearly creates a question of fact mandating a hearing pursuant to CPL 710.60 (see, People v Zarate, 160 AD2d 466 [1st Dept 1990]; People v Acosta, 150 AD2d 166 [1st Dept 1989]). Accordingly, the defendant is granted a suppression hearing with respect to the statements and the recovered weapon.
Sandoval Issues
All Sandoval issues are referred to the trial court.
Discovery and Bill of Particulars
The bill of particulars has been served. Discovery is granted to the extent of the information provided in the People’s response and the accusatory instrument. The People are reminded of their continuing obligation under Brady v Maryland (373 US 83 [1963]).
The motion pursuant to CPL 255.20 (3) to reserve the right to make supplemental motions is denied, except for good cause shown.
People’s Motion to Remove Edward Hammock, Esq.
The People move to disqualify defense counsel, Edward Hammock, from acting as trial counsel.
The right to counsel of one’s own choosing is not absolute but may be overridden where necessary (see, S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp., 69 NY2d 437). One restriction on the right is the “advocate-witness rule” which requires an attorney to withdraw from a case where it is likely that he or she will be called as a witness (Code of Professional Responsibility DR 5-102 [22 NYCRR 1200.21]; see, People v *423 Amato, 173 AD2d 714 [2d Dept 1991], lv denied 78 NY2d 919 [1991]).
The logical predicate for this rule is found in the Ethical Consideration of the rule, specifically Code of Professional Responsibility EC 5-9, which states, in part: “If a lawyer is both counsel and witness * * * the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate * * * in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his or her own credibility.” (See, Price v Price, 289 AD2d 11, 12 [1st Dept 2001].)
Mr. Hammock has unquestionably made himself a material witness for the pretrial hearings, as well as a potential trial witness. Mr. Hammock has indicated in his affirmation that he has every intention to testify on behalf of the defendant at the pretrial hearings. To do so and remain as attorney for the defendant would be in clear violation of the “advocate-witness rule” embodied in Code of Professional Responsibility DR 5-102 (People v Amato, supra; People v Rivera, 172 AD2d 633 [2d Dept 1991], lv denied 77 NY2d 999 [1991]).
Under these circumstances, Mr. Hammock is disqualified from acting as defendant’s attorney.

. According to the National Safe Kids Campaign, in 1997, 142 children ages 14 and under died from unintentional firearm related injuries. According to the Center for Injury Prevention and Control, in 1999, 306 children died from accidental shootings. In 2000, an estimated 1,800 children ages 14 and under were treated in hospital emergency rooms for accidental firearm related injures. Finally, according to the Children’s Defense Fund, in 2001, 214 children died from accidental shootings.

. See, Cal Penal Code § 12035 (West 1992, 1999 Supp); Conn Gen Stat Ann § 29-37i (West 1990, 1999); Del Code Ann, tit 11, § 1456 (1995); Fla Stat Ann § 748.05 (West 1992, 1999 Supp); Haw Rev Stat § 134-10.5 (1993); 720 Ill Comp Stat Ann 5/24-9; Iowa Code Ann § 724.22 (1999); Md Ann Code, art 27, § 36K (1996); Mass Gen Laws Ann, ch 140, § 131L; Minn Stat Ann § 609.666 (West 1987, 2000 Supp); NC Gen Stat Ann § 14-315.1 (West 1993, 1998 Supp); Nev Rev Stat Ann § 41.472 (1996); NH Rev Stat Ann § 650-C:1 (2001); NJ Stat Ann § 2C:58-15 (West 1995, 1999 Supp); RI Gen Laws Ann § 11-47-60.1; Tex Penal Code Ann § 46.13 (West 1994, 2000 Supp); Va Code Ann § 18.2-56.2 (Michie 1996); Wis Stat Ann § 948.55 (West 1996, 1999 Supp).
The Connecticut CAP law withstood judicial scrutiny. In State v Wilchinski (242 Conn 211, 700 A2d 1 [1997]), the Connecticut Supreme Court found it to be constitutional under the Federal and State Constitutions.

. Under both bills, the Penal Law would be amended, inter alia, by adding two new crimes: Criminally negligent storage of a weapon in the first and second degrees, “A person is guilty of criminally negligent storage of a weapon in the second degree when with criminal negligence, he or she stores or leave a loaded rifle, loaded shotgun or loaded firearm in any location where such rifle, shotgun or firearm is accessible to a person under the age of eighteen and such rifle, shotgun or firearm is discharged by such person under the age of eighteen, which causes serious physical injury to such person under the age of eighteen or any other person.” (Class E felony.) Causing the death of such person under the age of 18 or any other person, would constitute first degree criminally negligent storage of a weapon. (Class D felony.)

. See, Andrew J. McClurg, Child Access Prevention Laws: A Common Sense Approach to Gun Control, 18 St. Louis U Pub L Rev 47 (1999); Rachel Shaffe, Note, Child Access Prevention Laws: Keeping Guns Out of Our Children’s Hands, 27 Fordham Urb LJ 1985, 1987 (2000); also see, Richard Weizel, Loaded Guns: Whose Responsibility?, New York Times, Feb. 16,1997, at M13 (quoting Robert T. Cook, lobbyist and executive director of Coalition of Connecticut Sportsmen: “[cjourts are very reluctant to prosecute people who are already perceived as suffering a terrible tragedy”).

. Ibid.

. Jessica Reaves, Whom Can We Blame for the Michigan Shooting, Time, Mar. 2, 2000.

. Interestingly, in a Houston Law Review article, the author argues that the Texas CAP law is essentially redundant because the existing Texas Penal Code provision for “involuntary manslaughter” — which is almost identical to the New York State statute — is broad enough to provide a basis for prosecuting negligent adults who have allowed a child to have access to a gun (see, Ann-Marie White, A New Trend in Gun Control: Criminal Liability for the Negligent Storage of Firearms, 30 Hous L Rev 1389 [1993]).

. A firearm, particularly one that is loaded or has ammunition in close proximity, is considered a dangerous instrument and therefore requires a higher degree of care in its use and handling. This concept is set out in the Restatement (Second) of Torts, which provides: “those who deal with firearms * * * are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them” (Restatement [Second] of Torts § 298, Comment b [1965]; also see, Kingsland v Erie County Agric. Socy., 298 NY 409).